IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN DAVID WARREN, JR., ET AL., | Civ. No. 19-00232 JMS-WRP |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS HAWAII PACIFIC HEALTH, HAWAII PACIFIC HEALTH PARTNERS, INC., KAPIOLANI MEDICAL SPECIALISTS, AND DEVIN PUAPONG, M.D.'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 123 |
| vs. | |
| UNITED STATES OF AMERICA, ET AL., | |
| Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS HAWAII PACIFIC HEALTH, HAWAII PACIFIC HEALTH PARTNERS, INC., KAPIOLANI MEDICAL SPECIALISTS, AND DEVIN PUAPONG, M.D.'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 123**

## I. INTRODUCTION

This case arises from the alleged negligence of several Tripler Army Medical Center ("TAMC") and Kapiolani Medical Center for Women and Children ("KMCWC") medical professionals in the diagnosis and treatment of a one-month old infant, D.G.W., resulting in the child's permanent physical and mental disability.  On September 22, 2016, D.G.W.'s parents, John David Warren, Jr. and Laura Warren, filed suit on their own behalf and as guardians ad litem and next friends of D.G.W. and their other minor children, A.J.W., J.D.W. III, and A.A.W. (collectively "Plaintiffs"), against Defendants United States of America,

Hawaii Pacific Health, Hawaii Pacific Health Partners, Inc., Kapiolani Medical Specialists, Devin Puapong, M.D., and a number of Doe Defendants.  Plaintiffs seek relief for the following claims:

(1)   Medical Negligence;

(2)   Negligent Infliction of Emotional Distress;

(3)   Loss of Consortium;

(4)   Economic Losses; and

(5)   Lack of Informed Consent.

*See* Second Amended Complaint, ECF No. 104 at PageID ## 503-08.

Defendants Hawaii Pacific Health, Hawaii Pacific Health Partners, Inc., Kapiolani Medical Specialists, and Devin Puapong, M.D. ("Defendants"), now move for partial summary judgment as to: (1) all claims against Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc.; and Plaintiff's claims against all these Defendants for (2) economic losses; (3) lack of informed consent; (4) siblings' loss of consortium; and (5) negligent infliction of emotional distress.

Based on the following, Defendants' Motion is GRANTED with respect to all claims against Hawaii Pacific Health and Hawaii Pacific Health Inc., the pure economic losses claim, the lack informed consent claim, and the sibling Plaintiffs' loss of consortium claim.  But Defendants' Motion is DENIED with respect to the negligent infliction of emotional distress claim.

## II.  **BACKGROUND**

### A.    **Factual Background**

At this summary judgment stage, the court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (citation and quotation marks omitted).  Applying that standard, the court sets forth the following facts:

On September 22, 2016, one-month old Plaintiff D.G.W. was admitted to TAMC in an emergency condition.  ECF No. 168-5.  Her abdomen was distended and she was blue from the waist down.  *Id.* at PageID # 2180; ECF No. 168-6 at PageID # 2185.  Shortly after she was admitted, D.G.W. suffered cardiac arrest and required resuscitation.  ECF No. 168-5 at PageID # 2181; ECF No. 168-6 at PageID # 2184-85.  After she was resuscitated, she remained in critical condition.  ECF No. 168-5.  Dr. Devin Puapong, a pediatric surgeon, was called to TAMC pursuant to a contract between his employer, Kapiolani Medical Specialists, and TAMC.  ECF No. 124-6 at PageID ## 1225, 1229-30.  Dr. Puapong performed an evaluation of D.G.W.—which included briefing on D.G.W.'s medical history, performance of a physical assessment, and evaluation of ultrasound, X-ray, and CT scan results, ECF No. 177-7 at PageID ## 2582, 2593— but was unable to diagnose D.G.W.'s specific condition.  ECF No. 168-5 at

PageID # 2181.  Based on the testing done, although a midgut volvulus[1] remained on D.G.W.'s differential diagnosis[2] (along with a number of other conditions), ECF No. 168-6 at PageID # 2199, Dr. Puapong "reasonably excluded" a midgut volvulus as the cause of D.G.W.'s condition.  *See* ECF No. 177-7 at PageID ## 2577-79, 2582, 2586-87, 2592.

Dr. Puapong and Dr. Christopher Naun, the Pediatric Intensive Care Unit ("PICU") physician on duty when D.G.W. was admitted to TAMC, discussed D.G.W.'s medical treatment plan and decided not to perform any additional diagnostics, including an exploratory laparotomy or a upper gastrointestinal contrast study ("UGI").  *See* ECF No. 168-6 at PageID ## 2199-200; ECF No. 177-7 at PageID # 2580-81, 2583.  The doctors were concerned that a laparotomy—an invasive surgical procedure used to diagnose a variety of abdominal conditions— would be too dangerous to perform given D.G.W.'s critical condition.  ECF No. 168-6 at PageID # 2195; ECF No. 177-7 at PageID # 2561.  And Dr. Puapong

---

[1]  A midgut volvulus is a condition that occurs from an intestinal malrotation that causes a twist, or volvulus, of the intestine; this condition can restrict the supply of oxygenated blood to the small bowel and potentially result in necrose, or dying, of the intestine.  ECF No. 168-7 at PageID ## 2206-07.

[2]  Differential diagnosis is "the determination of which of *two or more diseases with similar symptoms* is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings."  *Stedman's Medical Dictionary* 243880 (Nov. 2014) (emphasis added); *see also*, *e.g.*, *Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 807 (3rd Cir. 1997) (quoting *Stedman's Medical Dictionary* 428 (25th ed. 1990)).

believed that a UGI—which is primarily used to diagnose intestinal malrotations, such as the midgut volvulus—was unnecessary because they had "reasonably excluded a midgut volvulus" and D.G.W. was not stable enough to undergo a UGI. *See*, *e.g.*, ECF No. 177-7 at PageID # 2583, 2592.

Instead, Dr. Puapong and Dr. Naun decided to admit D.G.W. to TAMC's PICU and continue to monitor her condition.  *Id*. at PageID # 2584.  At that point, Dr. Naun accepted primary responsibility for D.G.W., and numerous TAMC residents monitored her overnight.  ECF No. 168-6 at PageID ## 2199-200. But Dr. Puapong anticipated that he would be contacted if D.G.W.'s condition deteriorated.  ECF No. 177-7 at PageID # 2596.  D.G.W. remained critically-ill throughout the night.  ECF No. 177-11 at PageID # 2618.  By the morning of September 23, D.G.W. was experiencing increased signs and symptoms of organ failure, and her kidney function deteriorated to the point that she likely would require dialysis.  *Id*. at PageID # 2620.  Despite D.G.W.'s clinical deterioration, Dr. Puapong did not return to TAMC to further attend to D.G.W. in person.  ECF No. 177-7 at PageID # 2596.

On the morning of September 23, 2016, Dr. Naun discussed D.G.W.'s deteriorating condition with Dr. Xoinis at KMCWC and asked to transfer her to KMCWC because she required a higher level of care than TAMC could provide. ECF No. 177-11 at PageID ## 2619-20.  D.G.W. was transferred to KMCWC and

upon arrival, an emergency exploratory laparotomy was performed which revealed

D.G.W. had a volvulus with necrotic bowel.  ECF No. 177-7 at PageID # 2571;

ECF No. 168-7 at PageID # 2216-17.  Several emergency remedial procedures

were performed, and ultimately, D.G.W. lost approximately 70% of her small

bowel.  ECF No. 168-7 at PageID ## 2219-34.  As a result of this medical episode,

D.G.W., the youngest of four siblings, was hospitalized for four months,

underwent twelve surgeries, and was subsequently readmitted numerous times.  *Id.*

She is permanently physically and mentally disabled and requires constant medical

care.  ECF Nos. 168-3 at PageID ## 2170-73; 168-8 at PageID # 2266.

**B.**    **Procedural History**

Defendants filed their Motion for Partial Summary Judgment on

November 3, 2020, seeking summary judgment on the following:

(1)    All claims against Defendants Hawaii Pacific Health and Hawaii

Pacific Health Partners, Inc.;

(2)    Plaintiffs' claim for Economic Losses;

(3)    Plaintiffs' claim for Lack of Informed Consent;

(4)    The Loss of Consortium claim brought by D.G.W.'s siblings; and

(5)    Plaintiffs' claim for Negligent Infliction of Emotional Distress.

ECF No. 123 at PageID # 1086.

On January 11, 2021, Plaintiffs filed their Opposition, ECF No. 167, and on January 13, 2021, Defendant United States of America filed a Statement of no position, ECF No. 170.  Defendants filed their Reply on January 19, 2021.  ECF No. 176.  A hearing was conducted via video teleconference on February 1, 2021. ECF No. 193.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also, e.g.*, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

"The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact."  *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex*, 477 U.S. at 323).  Where, as here, the moving party does not have the ultimate burden of persuasion at trial, they bear both the initial burden of production and the ultimate burden of persuasion on their

motion for summary judgment. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (citing *Nissan Fire*, 210 F.3d at 1102). "'[W]hen the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts,'" but must come forward with specific facts showing that there is a genuine dispute for trial. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "[A]t least some 'significant probative evidence'" must be produced. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). "'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329-30 (9th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."); *see also Friedman*, 833 F.3d at 1185 (citing *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016)).

For purposes of Rule 56(a), a dispute is genuine only if there is a sufficient evidentiary basis on which "a reasonable jury could return a verdict for

the nonmoving party," and dispute of a fact is material only if it could affect the outcome of the suit under the governing law. *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (citing *Anderson*, 4 77 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Rookaird*, 908 F.3d at 459.

## IV. <u>DISCUSSION</u>

### A. Claims Against Defendants Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc., and Claim for Economic Losses

Defendants move for the dismissal of Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc., arguing that Plaintiffs lack expert testimony to support any claim against them. ECF No. 123-3 at PageID # 1097. Plaintiffs admit that, after discovery revealed the nature of the employment relationships among Defendants, their claims against Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc. should be dismissed. ECF No. 167 at PageID # 1971; ECF No. 193.[3] Likewise, in response to Defendants' Motion for Summary Judgment as to their economic losses claim, Plaintiffs "concede that their separately pled claim

---

[3] The Second Amended Complaint alleged that Dr. Puapong was acting within the scope of his employment with Kapiolani Medical Specialists "and/or [Hawaii Pacific Health Partners, Inc.] and/or [Hawaii Pacific Health]." ECF No. 104 at PageID # 487. The evidence establishes, however, that Dr. Puapong was not an employee of Hawaii Pacific Health or Hawaii Pacific Health Partners, Inc. ECF No. 123-3 at 1091.

for economic losses is subsumed in their negligence claims."  ECF No. 167 at PageID # 1986.

Accordingly, the court GRANTS Defendants' Motion for Partial Summary Judgment as to (1) all claims against Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc.; and (2) the economic losses claim (the fourth claim in Plaintiffs' Second Amended Complaint).  Defendants Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc. are DISMISSED from the case.

## B.    Plaintiffs' Fifth Claim for Relief: Informed Consent

Defendants next move for summary judgment as to Plaintiffs' informed consent claim.  Plaintiffs allege that Dr. Puapong did not provide the Warrens with full and accurate information necessary for them to make informed decisions regarding D.G.W.'s diagnosis and treatment, "fail[ing] to satisfy Hawaii's statute."  ECF No. 167 at PageID # 1979.  More specifically, Plaintiffs allege that Dr. Puapong failed to inform the Warrens of (1) the midgut volvulus as a condition on D.G.W.'s differential diagnosis; and (2) procedures available that could be used to diagnose a midgut volvulus (i.e., laparotomy and UGI) and the risks and benefits of each.  ECF No. 167 at PageID # 1975.  Defendants respond that there can be no informed consent claim without a diagnosis.  ECF No. 123-3 at PageID # 1105; ECF No. 176 at PageID ## 2371-72.  Thus, Defendants argue, because Plaintiffs' informed consent claim "remains rooted in the alleged failure to

10

[diagnose] the volvulus," Plaintiffs' remedy, if any, should be based solely upon their separately alleged medical negligence claim.  ECF No. 123-3 at PageID # 1104.

Hawaii has adopted a patient-oriented standard of disclosure in informed consent cases.  "[T]he motivating force and purpose of the doctrine of informed consent [is] aiding the individual patient in making an important decision regarding medical care."  *Carr v. Strode*, 79 Haw. 475, 485, 904 P.2d 489, 499 (1995).  "The dispositive inquiry regarding the physician's duty to disclose in an informed consent case, therefore, is not what the physician believes his or her patient needs to hear in order for the patient to make an informed and intelligent decision; the focus should be on what a reasonable person objectively needs to hear from his or her physician to allow the patient to make an informed and intelligent decision regarding proposed medical treatment."  *Id.* at 486, 904 P.2d at 500. Further, Hawaii courts have described the patient-oriented informed consent standard as "provid[ing] the patient with effective protection against a possible conspiracy of silence wherever it may exist among physicians."  *Id.* at 485, 904 P.2d at 499 (quoting *Bernard v. Char*, 79 Haw. 371, 381, 903 P.2d 676, 686 (Haw. App. 1995)).

To prove negligent failure to obtain informed consent in Hawaii, a plaintiff must first establish that the physician owed a duty of disclosure under Hawaii Revised Statutes ("HRS") § 671-3(b),[4] which provides:

> (b)    The following information shall be supplied to the patient or the patient's guardian or legal surrogate prior to obtaining consent to a proposed medical or surgical treatment or diagnostic or therapeutic procedure:
>
> (1)  The condition to be treated;
> (2)  A description of the proposed treatment or procedure;
> (3)  The intended and anticipated results of the proposed treatment or procedure;
> (4)  The recognized alternative treatments or procedures, including the option of not providing these treatments or procedures;
> (5)  The recognized material risks of serious complications or mortality associated with:
>
> > (A) The proposed treatment or procedure;
> > (B) The recognized alternative treatments or procedures; or
> > (C) Not undergoing any treatment or procedure; and

---

[4] Under Hawaii law, the elements of a lack of informed consent claim are:

(1) The physician owed duty of disclosure under HRS § 671-3(b);
(2) The physician breached that duty;
(3) The patient suffered injury;
(4) The physician's breach of duty was a cause of the patient's injury in that:
    a.  The physician's treatment was a substantial factor in bringing about the patient's injury; and
    b.  A reasonable person in the plaintiff's position would not have consented to the treatment that led to the injuries had the plaintiff been properly informed; and
(5) No other cause is a superseding cause of the patient's injury.

*Garcia v. Robinson*, 137 Haw. 388, 394, 375 P.3d 167, 173 (2016) (citing *Ngo v. Queen's Med. Ctr.*, 136 Haw. 54, 68-69, 358 P.3d 26, 40-41 (2015)).

(6) The recognized benefits of the recognized alternative treatments or procedures.

Thus, under the plain language of HRS § 671-3(b), physicians unambiguously have a duty to disclose "prior to obtaining consent to a proposed . . . diagnostic . . . procedure."

As an initial matter, it is necessary to frame the nature of Plaintiffs' informed consent claim. Importantly, Plaintiffs do not allege that Dr. Puapong failed to obtain informed consent before deciding which diagnostic procedure to pursue (i.e., laparotomy, UGI, or no further procedure) in order to diagnose D.G.W.'s condition *generally*. Instead, Plaintiffs tether their informed consent claim to Dr. Puapong's failure to provide information *specifically* about the midgut volvulus and the methods for diagnosing that specific condition. *See*, *e.g.*, ECF No. 167 at PageID # 1974 (arguing that Dr. Puapong did not inform the Warrens of "[t]he condition to be treated: Dr. Puapong never told the Warrens that a midgut volvulus was on D.G.W.'s differential diagnosis, nor did he explain what a midgut volvulus [was], or the risks it poses if not addressed promptly"); at PageID # 1975 (arguing that Dr. Puapong "also failed to inform [the Warrens] that a UGI . . . is the 'preferred' method of diagnosing a volvulus" and "that if D.G.W. had an unaddressed midgut volvulus, the risks included serious injury and death"); at PageID # 1978 ("[H]ere . . . a midgut volvulus was on the differential diagnosis and had not been ruled out."); at PageID # 1980 (explaining that Plaintiffs' experts

13

"all agree that a midgut volvulus is a surgical emergency requiring prompt intervention" and "a UGI is a recognized (and, in fact, the preferred) alternative diagnostic procedure for confirming or ruling out a midgut volvulus"; and that "had [the Warrens] been informed of *the condition being treated (midgut volvulus)*" they would have asked for a UGI (emphasis added)).  In short, Plaintiffs' informed consent claim alleges that Dr. Puapong had, and breached, a duty under HRS § 671-3(b) to disclose information specifically about the midgut volvulus and the available procedures to diagnose that condition.

Given the nature of Plaintiffs' allegations, there is no genuine issue as to any material fact with respect to the informed consent claim.  Although a midgut volvulus remained on D.G.W.'s differential diagnosis, Dr. Puapong had "reasonably excluded" it, as well as a number of other illnesses, as a probable diagnosis.  *See*, *e.g.*, ECF No. 177-7 at PageID ## 2577-80 (Dr. Puapong deposition statement that results of an abdominal CT scan "didn't show us any evidence of a midgut volvulus, so . . . at that time at least, [I] reasonably excluded it."); at PageID # 2581 ("[W]e looked for signs of a midgut volvulus on the CT scan . . . but again after discussing with everybody, we felt that [D.G.W.] did not have a surgical problem of which a midgut volvulus would be included."); at PageID # 2582 (stating that based upon D.G.W.'s "history that [Dr. Puapong] learned of, . . . her presentation when [he] examined her, . . . the results of the X-

ray, the ultrasound, and the CT scan," "[Dr. Puapong] felt that . . . a midgut volvulus was not likely."); at PageID # 2586-87 (stating that after "the appropriate testing and workup that was medically reasonable for [D.G.W.] at that time with regard to a midgut volvulus" Dr. Puapong had "reasonably excluded" the condition); at PageID # 2592 ("[B]ased on what we knew of [D.G.W.] at the time, we felt that we had reasonably excluded midgut volvulus as the cause of her condition."); at PageID # 2593 (reasonable exclusion of a midgut volvulus in D.G.W.'s case was based on the CT scan results "in conjunction with her history, her presentation, [and] what her abdominal exam was like").  Given that he had "reasonably excluded" the midgut volvulus, Dr. Puapong did not have a specific duty to inform Plaintiffs that the condition was on D.G.W.'s differential diagnosis. Nor did Dr. Puapong have a duty to disclose the options to diagnose a condition that he had "reasonably excluded."[5]

Plaintiffs argue that because Hawaii's informed consent statute is more expansive than those in many other jurisdictions—primarily because it requires that physicians obtain informed consent for diagnostic procedures—their

---

[5] Because Plaintiffs' informed consent claim fails for separate reasons, the court does not address Defendants' secondary argument that this claim should be dismissed because "Plaintiffs offer no expert testimony in support" of that claim.  ECF No. 123-3 at PageID # 1104.

informed consent claim should go forward.[6]  And indeed, in Hawaii, "[p]hysicians have an obligation to obtain the informed consent of their patients before administering diagnostic . . . procedures."  *Barcai v. Betwee*, 98 Haw. 470, 483, 50 P.3d 946, 959 (2002).  But just because Hawaii's informed consent statute includes a duty to obtain informed consent in advance of a diagnostic procedure, the scope of this duty cannot be read to require disclosure of all conditions on a patient's differential diagnosis—no matter how unlikely—and of all the conceivable diagnostic procedures that could possibly confirm or rule out any or all of those conditions.[7]  Nor is it reasonable for a doctor to obtain informed consent for the diagnostic procedures available to identify a specific condition that has already been reasonably excluded as a likely diagnosis.  In order to conduct a diagnostic procedure, a physician must believe the procedure is necessary.  If a physician has excluded a condition, it follows that the physician does not have a duty to

---

[6]  In their Opposition, Plaintiffs correctly note that courts in other jurisdictions, like Maryland, have ruled that "no duty exists for diagnostic procedures" and that other states' informed consent statutes are narrower in scope than Hawaii's.  ECF No. 167 at PageID ## 1975-76.

[7]  In fact, when contemplating "the scope of the disclosure the physician is legally obligated to make" in the landmark case *Canterbury v. Spence*—the very cases that established the modern patient-oriented regime of informed consent in medical procedures—the D.C. Circuit recognized that "[i]t seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment—no matter how small or remote—and generally unnecessary from the patient's viewpoint as well.  Indeed, the cases speaking in terms of 'full' disclosure appear to envision something less than total disclosure[.]"  *Canterbury v. Spence*, 464 F.2d 772, 786 (D.C. Cir. 1972) (internal footnotes omitted).

perform—or obtain informed consent to perform—a procedure specifically for the purpose of diagnosing or treating that excluded condition.  Stated differently, "a health care provider who believes the patient does not have a particular disease cannot be expected to inform the patient about the unknown disease or possible treatments for it."  *Gomez v. Sauerwein*, 331 P.3d 19, 23 (Wash. 2014) (en banc); *cf. Roukounakis v. Messer*, 826 N.E.2d 777, 781 (Mass. App. 2005) (citing *Bays v. St. Luke's Hosp.*,  825 P.2d 319, 322 (Wash. App. 1992)) (stating that "the duty to disclose does not arise until the physician becomes aware of the condition by diagnosing it.") (internal quotation marks omitted).  The Hawaii Supreme Court would likely adopt the same rule.[8]

Further, "this rule is necessary to avoid imposing double liability on the provider for the same alleged misconduct."  *Gomez*, 331 P.3d at 23.  And indeed, by focusing on Dr. Puapong's failure to provide information regarding the midgut volvulus, Plaintiffs are essentially recasting their medical negligence claim as one involving informed consent.  In fact, although Plaintiffs argue in a

---

[8] Plaintiffs argue that their claim is more similar to one in which "a provider [] knows about two alternative treatments but informs the patient of only one[.]"  ECF No. 167 at PageID # 1978 (quoting *Gomez*, 331 P.3d at 23).  And the legislative history of HRS § 671-3 "indicat[es] that the failure to disclose an alternative treatment [may] give[] rise to a cause of action for failure to provide informed consent."  *Ray v. Kapiolani Med. Specialists*, 125 Haw. 253, 267, 259 P.3d 569, 583 (2011).  But as the court has explained, that is not the case here; at the time in question, Dr. Puapong had "reasonably excluded" a midgut volvulus, deeming it "unlikely."  Dr. Puapong was not administering any diagnostic procedures specifically for a midgut volvulus because he did not believe D.G.W. was suffering from one.

conclusory way that "separate facts support the medical negligence and informed consent claims," ECF No. 167 at PageID # 1971, their Opposition fails to specify any facts that distinguish the claims.  As discussed, even though Dr. Puapong had "reasonably excluded" the midgut volvulus, Plaintiffs argue that he breached his duty to obtain informed consent because he did not inform the Warrens "that a midgut volvulus was on D.G.W.'s differential diagnosis, . . . explain what a midgut volvulus is, . . . [explain] the risks it poses if not addressed promptly[,]" or inform the Warrens of a UGI as "the 'preferred' method of diagnosing a volvulus."  ECF No. 167 at PageID ## 1974-75.

In short, Dr. Puapong had "reasonably excluded" the midgut volvulus as D.G.W.'s affliction and, accordingly, had no duty under HRS § 671-3(b) to propose to the Warrens a diagnostic procedure meant to confirm or rule out *a midgut volvulus*.  Based on the foregoing, the court GRANTS Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Fifth Claim for Relief (Informed Consent).

## C.      Sibling Loss of Consortium

Defendants also seek summary judgment as to Plaintiffs' sibling loss of consortium claim, arguing that such a cause of action is not recognized in Hawaii law.  Plaintiffs acknowledge that Hawaii courts have yet to rule on sibling loss of consortium but argue that the Hawaii Supreme Court would likely

18

recognize such a claim.  ECF No. 167 at PageID # 1985.  The court agrees with

Plaintiffs that a loss of consortium claim advanced by a sibling *could* be cognizable

under Hawaii law.  But Plaintiffs have failed to advance an actionable claim here.

      Claims for loss of consortium are primarily governed by Hawaii's

wrongful death statute, HRS § 663-3.[9]  Section 663-3 allows loss of consortium

claims based on "the death of a person . . . caused by the wrongful act, neglect, or

default of any person."  Under the statute's plain language, such a cause of action

is available only to "the surviving spouse, reciprocal beneficiary, children, father,

mother, [or] any person wholly or partly dependent upon the deceased person."  *Id.*

§ 663-3(b); *see also Lealaimatafao v. Woodward-Clyde Consultants*, 75 Haw. 544,

552, 867 P.2d 220, 224 (Haw. 1994) ("[T]he language of HRS § 663-3 is plain and

unambiguous.").

      As a preliminary matter, the Hawaii Supreme Court has allowed loss

of consortium claims arising from "injury short of death caused by the wrongful

---

[9]  Plaintiffs attempt to argue that a common law claim for sibling loss of consortium exists independent of the wrongful death statute.  *See* ECF No. 167 at PageID # 1981.  This argument is unavailing.  The common law loss of consortium claim has been subsumed by the wrongful death statute.  *See Rohlfing v. Moses Akiona, Ltd.*, 45 Haw. 373, 394, 369 P.2d 96, 106 (1961) (explaining that the "common law action for wrongful death was merged with the statutory action under [HRS § 663-3]" and that it was the legislature's "plain intent" that "all of the persons enumerated therein shall join in one action and be governed by the provisions of that section"), *overruled on other grounds by Greene v. Texeira*, 54 Haw. 231, 505 P.2d 1169 (1973); *see also Castro v. Melchor*, 142 Haw. 1, 13-14, 414 P.3d 53, 65-66 (2018); *In re Hawaii Federal Asbestos Cases*, 854 F. Supp. 702, 710 (D. Haw. 1994) ("The statutory wrongful death action is in the nature of a common law claim for loss of consortium.").

conduct of another." *Masaki v. General Motors Corp.*, 71 Haw. 1, 20, 780 P.2d 566, 577 (1989) (explaining that "no meaningful distinction can be drawn between death and severe injury where the effect on consortium is concerned"); *see also Castro v. Melchor*, 142 Haw. 1, 12-14, 414 P.3d 53, 64-66 (2018) (explaining that HRS § 663-3 is a remedial statute that should be liberally construed).[10]  That D.G.W. suffered a severe injury rather than passed away does not pose an impediment to a loss of consortium claim brought by an appropriate party.

But D.G.W.'s siblings are not appropriate parties in this case. Siblings are not specifically enumerated in HRS § 663-3.  D.G.W.'s siblings can only state a claim for loss of consortium if they were "wholly or partly dependent upon" their one-month old sister.  *Castro*, 142 Haw. at 14, 414 P.2d at 66 (explaining that HRS § 663-3 provides that "anyone in specified relationships with the deceased [i.e., spouse, parent, child, or reciprocal beneficiary], regardless of dependency, [can] recover under the statute, and that anyone dependent on the deceased, regardless of relationship, [can] recover under the statute").  The Hawaii

---

[10]  To the extent the *Masaki* creates a common law rather than statutory cause of action for loss of consortium in the case of severe injury, that cause of action closely tracks the loss of consortium action in the case of wrongful death found under HRS § 663–3.  *Masaki*, 71 Haw. at 19-20, 780 P.2d at 576-77 (explaining that "[l]oss of filial consortium is a recognized cause of action in Hawaii under our wrongful death statute, Hawaii Revised Statutes (HRS) § 663-3" and that in "wrongful death actions pursuant to HRS § 663-3, no arbitrary age limit is placed upon recovery for loss of filial consortium.  HRS § 663-3 makes no distinction between minor and adult children.  We see no reason why in cases of severe injury the result should be any different").  Thus, regardless of whether a claim for loss of consortium of an injured person is found in the common law or under the statute, the analysis is effectively the same.

Supreme Court has interpreted the statutory term "dependent" broadly, in keeping

with the remedial purpose of the statute.  In *Lealaimatafao*, the Court explained:

> Dependency may result from different causes.  It may
> result from the lack of physical necessities such as food,
> shelter and clothing.  It may result from moral and social
> necessities such as education.  Physical, moral and social
> necessities are not confined to the subjects mentioned.
> Others are readily conceivable.

75 Haw. at 552, 867 P.2d at 224.  That is, "[plaintiffs] are the dependents of

[D.G.W.] if they wholly or partly derived physical, moral, and/or social necessities

from [her]."  *Id.*

Under this expansive definition of dependency, it is certainly

conceivable that a sibling *could* state a claim for loss of consortium.  *Castro*, 142

Haw. at 14, 414 P.2d at 66.  Whether the requisite dependency exists is a question

of fact.  And, indeed, other courts have recognized sibling loss of consortium

claims where the facts suggest that the plaintiffs were dependent on their deceased

sibling.  *See, e.g.*, *Wachocki v. Bernalillo Cnty. Sheriff's Dept.*, 265 P.3d 701, 704

(N.M. 2011)) (holding that sibling loss of consortium claims are actionable where

a plaintiff demonstrates mutual dependence between themselves and their deceased

sibling as measured by the duration of the relationship, extent and quality of shared

experience, and their emotional reliance on each other, among other factors);

*Complaint of Patton-Tully Transp. Co.*, 797 F.2d 206, 213 (5th Cir. 1986)

(allowing minor siblings to recover on a loss of consortium theory under general

maritime principles where a deceased sixteen-year-old was the sole source of income for his family). But where there is no factual showing of dependency, a sibling loss of consortium claim cannot be sustained. *See, e.g.*, *Long v. Dugan*, 788 P.2d 1, 2 (Wash. Ct. App. 1990) (holding, under analogous wrongful death statute, that older sisters could not recover for the wrongful death of their three-year old brother on a loss of consortium theory because there was "no suggestion" that the older sisters were dependent upon him); *Wachocki*, 265 P.3d at 704 (finding insufficient evidence of mutual dependence where plaintiff's deceased brother was his best friend, roommate, and role model, and upon who he relied for advice and emotional support); *Silva v. Lovelace Health Sys., Inc.*, 331 P.3d 958, 968-69 (N.M. Ct. App. 2014) (finding insufficient evidence of "mutual dependence" to support a sibling loss of consortium claim where adult siblings were best friends, spoke daily, and lived together on weekends).

Here, Plaintiffs have not presented any facts to support their sibling loss of consortium claim. Rather, they advance the blanket argument that siblings in general are dependent on one another for "social companionship, comfort, development, and growth." ECF No. 167 at PageID # 1985. While this theory may be viable depending upon the facts, it is not a per se argument. Not all siblings rely upon each other in this way. And plaintiffs have not presented any *facts* showing that the Warren children were wholly or partly dependent upon their

one-month old sister for physical, moral, or social necessities.  Accordingly,

Defendants' Motion for Summary Judgment is GRANTED as to the sibling loss of

consortium claim.

## D.    Negligent Infliction of Emotional Distress

Finally, Defendants move for summary judgment on Plaintiffs' claim

for negligent infliction of emotional distress ("NIED").  In their Motion,

Defendants argue that Plaintiffs' NIED claim is "legally subsumed within their

claim for medical negligence."  ECF No. 123-3 at PageID # 1107.  That is, given

that the NIED claim undisputedly arises from the same factual allegations as the

medical negligence claim, "Plaintiffs cannot circumvent their obligations to

establish *medical* negligence by labeling their claims as *ordinary* negligence."  *Id.*

But in their Opposition, Plaintiffs clarify that they are not attempting

to state their NIED claim under an ordinary negligence theory.  Rather, because a

predicate to an NIED claim is a physical injury resulting from the defendants'

conduct—in this case D.G.W.'s physical injury resulting from the Defendants'

alleged medical negligence—Plaintiffs' NIED claim "stands or falls based on a

showing of medical negligence."  ECF No. 167 at PageID # 1987 n.16 ("The NIED

claim requires a demonstration of negligence in the first instance, which in this

case requires a showing that Defendants were medically negligent."); *see also*

*Tabieros v. Clark Equip. Co.*, 85 Haw. 336, 361, 944 P.2d 1279, 1304 (1997)

(explaining that NIED is an independent tort, but one that is "derivative," in the sense that to prevail on an NIED claim, plaintiffs must establish an underlying negligence claim under the applicable standard of care); *see also, e.g.*, *Taylor v. Fletcher Allen Health Care*, 60 A.3d 646, 651-52 (Vt. 2012) (explaining that because a claim for NIED is premised on a finding of negligence under the applicable standard of care, if a plaintiff's claim for medical negligence fails, their "claim for negligent infliction of emotional distress necessarily fails too"); *Malinou v. Miriam Hosp.*, 24 A.3d 497, 512 ( R.I. 2011) (holding that because the plaintiff "failed to present sufficient evidence to support his underlying claims for medical negligence and wrongful death . . . plaintiff does not have a viable claim for negligent infliction of emotional distress").

At the February 1, 2021 hearing, Defendants agreed that so long as prevailing on the NIED claim would require Plaintiffs to prove medical negligence, the claim could survive summary judgment.  *See* ECF No. 193. Accordingly, the Motion for Summary Judgment as to the NIED claim is DENIED.  To be clear, to prevail on their NIED claim, Plaintiffs will be required to first prove medical negligence.

## V.  <u>CONCLUSION</u>

Defendants' Hawaii Pacific Health, Hawaii Pacific Health Partners, Inc., Kapiolani Medical Specialists, and Devin Puapong, M.D.'s Motion for Partial

Summary Judgment is GRANTED as to: (1) dismissal of Hawaii Pacific Health and Hawaii Pacific Health Partners, Inc., as defendants in this action; (2) Plaintiffs' economic losses claim; (3) Plaintiffs' informed consent claim; and (4) sibling Plaintiffs' loss of consortium claim. The Motion for Partial Summary Judgment is DENIED as to Plaintiffs' negligent infliction of emotional distress claim.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 10, 2021



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Warren et al. v. United States et al.*, Civ. No. 19-00232 JMS-WRP, Order Granting in Part Denying in Part Defendants Hawaii Pacific Health, Hawaii Pacific Health Partners, Inc., Kapiolani Medical Specialists, and Devin Puapong, M.D.'s Motion for Partial Summary Judgment, ECF No. 123