IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN DAVID WARREN, JR., ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, ET AL., <br><br> Defendants. | Civ. No. 19-00232 JMS-WRP <br><br> ORDER DENYING DEFENDANTS KAPIOLANI MEDICAL SPECIALISTS AND DEVIN PUAPONG, M.D.'S MOTION TO PRECLUDE DEFENDANT UNITED STATES OF AMERICA'S EXPERT WITNESS, THOMAS E. WISWELL, M.D., FROM OPINING AS TO STANDARD OF CARE, <br> ECF NO. 225 |

**ORDER DENYING DEFENDANTS KAPIOLANI MEDICAL SPECIALISTS AND DEVIN PUAPONG, M.D.'S MOTION TO PRECLUDE DEFENDANT UNITED STATES OF AMERICA'S EXPERT WITNESS, THOMAS E. WISWELL, M.D., FROM OPINING AS TO THE STANDARD OF CARE, ECF NO. 225**

I. INTRODUCTION

Before the court is Defendants Kapiolani Medical Services ("KMS") and Dr. Devin Puapong's (collectively, "KMS Defendants") Motion to Preclude the United States of America's expert witness, Dr. Thomas E. Wiswell, from opining as to the standard of care applicable to Dr. Puapong ("Motion to Preclude"). ECF No. 225. The KMS Defendants attempt to argue under this court's ruling in *Krizek v. Queen's Medical Center*, 2020 WL 5633848 (D. Haw. Sept. 21, 2020), that Dr. Wiswell, as a neonatologist, cannot opine as to the

standard of care applicable to Dr. Puapong, a pediatric surgeon, because he is not qualified in the same specialty field of medicine. This argument is meritless. The KMS Defendants badly misconstrue *Krizek*, which requires an individualized assessment of an expert's "knowledge, skill, experience, training, [and] education" to determine if that expert is qualified to provide the "specific opinion[s]" that he offers. *Id.* at *5. The KMS Defendants additionally argue that Dr. Wiswell's opinions are inadmissible because his methodology is unreliable. This argument, too, fails. Dr. Wiswell properly applied his knowledge and experience, along with reference to peer-reviewed literature, to examine the evidentiary record and draw reliable conclusions.

For these reasons, and as set forth in more detail to follow, the court DENIES the KMS Defendants' Motion to Preclude Dr. Wiswell from opining as to the standard of care applicable to Dr. Puapong.

## II. BACKGROUND

### A. Factual Background

At around 5:30 p.m. on September 22, 2016, the Warrens brought their one-month-old daughter, D.G.W., to the Tripler Army Medical Center ("Tripler") emergency department after noticing that she was suffering from abdominal distention, difficulty breathing, and increased fussiness. ECF No. 255-10 at PageID # 3138. D.G.W. became bradycardic while in the emergency

department waiting room. *Id.* She was then brought into the resuscitation room, where CPR was performed. *Id.*

After D.G.W. was resuscitated, she remained in critical condition. Dr. Fitch, her emergency department attending physician, was concerned about an apparent bowel obstruction and the possibility of a midgut volvulus.[1] *Id.* at PageID # 3139. An x-ray, ultrasound, and CT scan of D.G.W.'s abdomen were performed, revealing "grossly distended intestinal loops consistent with an obstruction pattern." *Id.* Dr. Devin Puapong, one of only three pediatric surgeons in the state, was called to Tripler to evaluate D.G.W.[2] ECF No. 225-6 at PageID ## 3076-78. Dr. Puapong reviewed D.G.W.'s medical history, performed a physical assessment, and evaluated the test results, but was unable to diagnose her specific condition. ECF No. 168-5 at PageID # 2181. Dr. Puapong "reasonably excluded" a midgut volvulus as the cause of D.G.W.'s condition, although it remained on D.G.W.'s differential diagnosis. *See* ECF No. 177-7 at PageID ## 2577-79, 2586-87; ECF No. 168-6 at PageID # 2199.

---

[1] A midgut volvulus is a condition that occurs from an intestinal malrotation that causes a twist, or volvulus, of the intestine; this condition can restrict the supply of oxygenated blood to the small bowel and potentially result in necrose, or dying, of the intestine. ECF No. 168-7 at PageID ## 2206-07.

[2] Dr. Puapong is employed by KMS. Pursuant to a contract between KMS and Tripler, Dr. Puapong served as an on-call pediatric surgeon available for consult at Tripler. ECF No. 225-6 at PageID ## 3076-77.

Dr. Puapong and Dr. Christopher Naun, the pediatric intensive care unit ("PICU") attending physician, discussed D.G.W.'s medical treatment plan and decided not to perform any additional diagnostics, including an exploratory laparotomy or upper gastrointestinal contrast study ("UGI"). *See* ECF No. 168-6 at PageID ## 2199-200; ECF No. 177-7 at PageID ## 2580-81, 2583. Dr. Puapong left the hospital with instructions to contact him if D.G.W.'s condition worsened and the baby was transferred to the PICU. ECF No. 225-10 at PageID # 3139.

D.G.W.'s condition worsened overnight. By the morning of September 23, D.G.W. was experiencing symptoms of renal failure. ECF No. 231-4 at PageID # 3421. Early in the morning on September 23, Dr. Naun contacted Dr. Puapong to discuss D.G.W.'s deteriorating condition. ECF No. 225-10 at PageID # 3139. Dr. Puapong stated that he did not believe surgery necessary and did not return to Tripler to further attend to D.G.W. in person. *Id.*

Later that morning, Dr. Naun spoke to the PICU attending physician at Kapiolani Medical Center ("Kapiolani") and arranged for D.G.W. to be transferred there because she required dialysis, a treatment that was unavailable at Tripler. *Id.*; *see also* ECF No. 177-11 at PageID ## 2619-20. At 10:02 a.m., D.G.W. was admitted to Kapiolani where her condition continued to deteriorate. ECF No. 231-4 at PageID # 3421. Early in the afternoon of September 23, Dr. Puapong performed an emergency laparotomy, which revealed a midgut volvulus

with substantial necrotic bowel.  ECF No. 225-10 at PageID # 3139.  Dr. Puapong performed several emergency remedial procedures, but ultimately, D.G.W. lost approximately 70% of her small bowel.  *Id.*  D.G.W. remained hospitalized for four months, undergoing many additional surgeries.  *Id*.  She has suffered numerous infections and other complications.  *Id.*  at PageID ## 3139-40.  Her family moved to Indiana in 2018 so that she could receive ongoing treatment at Lurie Children's Hospital in Chicago.  *Id.* at PageID # 3140.  D.G.W. is permanently physically and mentally disabled and requires constant medical care.  *Id.*

**B.    Dr. Wiswell's Qualifications and Opinions**

Defendant the United States of America retained Dr. Thomas E. Wiswell to opine as to the standard of care for diagnosis and treatment of a midgut volvulus in an infant patient.  *See id.* at PageID ## 3140-41.

*1.    Dr. Wiswell's Qualifications*

Dr. Wiswell is a neonatologist.  *Id.* at PageID # 3141.  He currently practices as a staff neonatologist at Kaiser Permanente Moanalua Medical Center in Honolulu, Hawaii.  *Id.*  Dr. Wiswell graduated from medical school at the University of Pennsylvania in 1977, after which he completed a three-year residency in pediatrics followed by a two-year fellowship in neonatology, both at Tripler.  ECF No. 225-11 at PageID # 3143.  He achieved board certification in

pediatrics in 1983 and board certification in neonatology in 1985. *Id.* Dr. Wiswell has continuously practiced as a neonatologist from 1980 to the present. *Id.* at PageID # 3145. Simultaneously, he consistently taught as a professor of pediatrics at various medical schools from 1982 to 2017. *Id.* at PageID # 3144. In his capacity as a professor, he was involved on several occasions in selecting textbooks and other materials used to teach and train pediatric surgeons. ECF No. 230-1 at PageID # 3236. And he has "trained and educated many Pediatric Surgeons-in-training, Pediatricians, and/or Neonatologists in the diagnosis and treatment of Malrotation and Volvulus." *Id.* at PageID # 3237. Dr. Wiswell has also published extensively in the fields of neonatal and perinatal care, including several peer-reviewed articles on intestinal issues. *See* ECF No. 225-11 at PageID ## 3151-3163. During his more than 40 years of practice as a neonatologist, Dr. Wiswell has been on teams that have diagnosed and treated a midgut volvulus on at least 30 occasions. ECF No. 231-9 at PageID # 3467.

During his deposition, when asked why he, as a neonatologist, is qualified to opine as to the standard of care for diagnosis and treatment of a midgut volvulus, Dr. Wiswell explained: "I have the training and background, education and experience to be able to recognize an acute abdomen, the knowledge to know that at this age with a similar kind of presentation that [D.G.W.] had, that there is a very high chance that it's a volvulus." *Id.* at PageID # 3471. He continued,

6

"[neonatologists are] on the front lines, we're the first ones who see, we're the first ones who recognize it, we are typically the first ones that may order some imaging while we're coordinating things with surgeons.  And so it's . . . [that] training, experience, knowledge . . . that qualify me for recognizing that there is a high chance of a volvulus and that it's a surgical emergency that needs to be taken care of."  *Id.* at PageID ## 3471-72.  Finally, he concluded, "I cannot perform the surgery and most physicians that see babies that they're suspicious of having a volvulus are not pediatric surgeons, but they recognize it and they get the baby somewhere . . . [to] get surgeons involved [to perform the necessary surgical treatment]."  *Id.* at PageID # 3472.

       2.     ***Dr. Wiswell's Opinions***

In a November 19, 2020 letter, Dr. Wiswell submitted his opinions as to the medical care provided to D.G.W.  ECF No. 225-10.  He based his opinions upon his review of the Second Amended Complaint; six expert reports authored by doctors; D.G.W.'s medical records from Tripler, Kapiolani, and Lurie Children's Hospital; and the results of imaging studies conducted at all three facilities.  *Id.* at PageID # 3135.

Dr. Wiswell opines that Dr. Puapong violated the standard of care he owed D.G.W. to properly diagnose and timely treat her midgut volvulus.  Specifically, he opines that "[t]he gold standard in diagnosing a midgut volvulus is

to perform an upper GI series" and that there "should be no delays in making the diagnosis" in order to avert "adverse outcomes." *Id.* at PageID # 3140.  In fact, Dr. Wiswell explains, "[i]t is so important to relieve the volvulus that when a 1-month old child presents with apparent intestinal obstruction, many surgeons take the child immediately to surgery without performing any imaging studies or time-consuming medical interventions." *Id.*

Dr. Wiswell opines that Dr. Puapong violated the standard of care in diagnosing D.G.W. when he "did not [order] an upper GI series to be performed, nor did he perform an exploratory laparotomy in a timely fashion." *Id.*  Dr. Wiswell further explained that Dr. Puapong—rather than any other member of the care team—was responsible for this breach because "[a] pediatric surgeon is the individual with the background, training, and experience to make surgical diagnoses and manage young infants with findings of intestinal obstruction. . . . Treating physicians without a pediatric surgeon's background . . . routinely defer to the specialist in managing likely surgical emergencies." *Id.* at PageID # 3140.  Thus, according to Dr. Wiswell, once Dr. Puapong was consulted, "he became accountable for appropriate patient assessment and timely surgical intervention." *Id.*  And, in Dr. Wiswell's opinion, "Dr. Puapong abrogated this responsibility." *Id.*

C.     **Procedural Background**

Plaintiffs filed their Second Amended Complaint ("SAC") on August 18, 2020, ECF No. 104, alleging various claims against the United States and Tripler medical staff involved in D.G.W.'s care (collectively, the "United States"), as well as against Kapiolani Medical Services and Dr. Puapong (the KMS Defendants). Dr. Wiswell submitted his export report on behalf of the United States on November 19, 2020. ECF No. 225-10. He was deposed on February 9 and 22, 2021. ECF No. 224 at PageID # 3000. On March 22, 2021, the KMS Defendants filed their Motion to Preclude Dr. Wiswell from opining as to the standard of care for Dr. Puapong. ECF No. 225. Both the United States and Plaintiffs filed Oppositions on April 7, 2021, ECF Nos. 230 & 231, and the KMS Defendants filed a Reply on April 14, 2021, ECF No. 233. This matter is decided without hearing pursuant to Local Rule 7.1(c). *See* ECF No. 235.

### III.  **STANDARD OF REVIEW**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In applying this rule, the district court acts as gatekeeper to prevent unreliable expert testimony from reaching the jury. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("*Daubert I*"). That is, the district court must decide if the expert is qualified by "knowledge, skill, experience, training, or education . . . to give expert testimony in the relevant field." *Krizek*, 2020 WL 5633848, at *4 (D. Haw. Sept. 21, 2020) (quotation omitted). In carrying out this responsibility, the district court exercises discretion and flexibility in determining what evidence is relevant, reliable, and helpful to the trier of fact. *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir. 1998); *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994) ("District courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in [*Daubert I*].").

Applying this standard, the Ninth Circuit has articulated a two-prong test for admissibility of expert testimony. First, the proffered testimony must be reliable, i.e., the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science."

10

*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (citation and quotation signals omitted).  Second, the testimony must meet "the 'fit' requirement," i.e., it must "logically advance[] a material aspect of the proposing party's case."  *Id.*

The reliability prong focuses on the expert's "principles and methodology, not on the conclusions they generate."  *Daubert I*, 509 U.S. at 595.  As a threshold matter, this means the expert must adequately "explain the methodology . . . followed to reach their conclusions."  *Daubert II*, 43 F.3d at 1319; *Rincon*, 28 F.3d at 924 (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable).  Further, in order to be deemed reliable, expert testimony must be "grounded in the methods of science."  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).  Courts evaluate the scientific reliability of an expert's reasoning or methodology using, as appropriate, criteria such as testability, publication in peer reviewed literature, and general acceptance in the scientific community.  *See Daubert I*, 509 U.S. at 593-95; *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).  But the inquiry is "flexible."  *Daubert I*, 509 U.S. at 594; *Wendell*, 858 F.3d at 1232 ("These factors are illustrative, and they are not all applicable in each case.").  "Shaky but admissible evidence is to be attacked by

11

cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (footnotes omitted); *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017).

The "fit" inquiry focuses on "relevance," requiring the district court to assess the probative value of the expert evidence. *Daubert I*, 509 U.S. at 595. Courts must "exclude proffered scientific evidence" unless "convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17. And to be admissible as expert testimony, "the subject matter at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002).

## IV. <u>DISCUSSION</u>

The KMS Defendants make two arguments in support of their Motion to Preclude. First, they argue that Dr. Wiswell, as a neonatologist, cannot opine as to the standard of care applicable to Dr. Puapong, a pediatric surgeon. Second, they argue that even if Dr. Wiswell could provide a standard of care, his opinions should be stricken because they are not supported by credible methodology. Both arguments fail.[3]

---

[3] There is no dispute that Dr. Wiswell's opinions logically advance a material aspect of the case. Accordingly, the court does not address the "fit" prong of the admissibility test. *See Daubert II*, 43 F.3d at 1315.

### A.   Dr. Wiswell Is Qualified to Opine as to Standard of Care

Citing this court's ruling in *Krizek v. Queen's Medical Center*, 2020 WL 5633848 (D. Haw. Sept. 21, 2020), the KMS Defendants first argue that Dr. Wiswell, as a neonatologist, "should not be permitted to render opinion testimony as to what the pediatric surgery standard of care required Dr. Puapong to do" because "[t]he medical standard of care that may apply to a pediatrician/neonatologist is inherently and significantly different from the standard of care that applies in the practice of surgery, including pediatric surgery."  ECF No. 225-3 at PageID # 3027.  This argument grossly misapprehends *Krizek*.

As this court recognized in *Krizek*, "Rule 702 'contemplates a broad conception of expert qualifications.'"  2020 WL 5633848, at *5 (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)).  And, accordingly, "'courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats.'"  *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)).  Nevertheless, this court went on to explain that "the mere fact of being a physician in one specialty does not by itself qualify that physician as an expert in another."  *Id.*  The KMS Defendants illogically take from this statement a bright-line rule that a physician in one specialty can *never* opine as to the standard of care applicable to another specialty.

13

But as explained in *Krizeck*, while a physician's specialty may inform the *Daubert* analysis, it is certainly not dispositive. Rather, in exercising its gatekeeping function, the court must determine whether an expert is qualified by "'look[ing] at each of the conclusions the expert draws individually to see if he has the adequate education, skill, and training to reach them.'" *Id.* (quoting *Gayton*, 593 F.3d at 617). That is, Rule 702 requires an *individualized* inquiry into the qualifications of a *particular* expert to give a *particular* opinion. An expert's specialty may be a relevant *factor* in that inquiry, but it cannot, as the KMS Defendants assert, be blanketly determinative in itself.[4]

Undertaking such a particularized inquiry in *Krizek*, this court determined that the expert, an ICU physician, lacked the credentials to opine as to the standard of care applicable to the prevention of Wernicke's encephalopathy in an emergency room setting. *Id.* Specifically, the court found the expert to be unqualified because (1) he lacked experience working in the fast-paced, life-or-

---

[4] The KMS Defendants' argument might carry more weight if Dr. Wiswell's opinion concerned the surgical procedures Dr. Puapong performed on D.G.W. As a neonatologist, Dr. Wiswell may not have the expertise to evaluate such surgical procedures. Indeed, "[t]o find that an expert in one specialty (based on that expertise alone) is qualified to opine as an expert in another specialty would require, at a minimum, the proponent of that testimony to show sufficient similarity between the specialties and the standards of care." *Krizek*, 2020 WL 5633848, at *6. Taken to the extreme, it is unlikely, for example, that a sports medicine doctor would be qualified to opine as to the standard of care owed by brain surgeon performing brain surgery. But Dr. Wiswell opines only as to the standard of care applicable to diagnosing and treating a midgut volvulus, and the KMS Defendants have offered no support for their contention that Dr. Wiswell, as a neonatologist, is unqualified to render this opinion.

14

death emergency room setting; and (2) he had no experience preventing or treating the specific condition at issue—Wernicke's encephalopathy—in that emergency room setting. *Id.* at *5-6. As should be obvious, this conclusion by no means stands for the principle that only physicians sharing the same specialty can provide an expert opinion as to the standard of care applicable to another physician.

Here, the KMS Defendants do not explain why Dr. Wiswell is unqualified to opine as to the standard of care applicable to Dr. Puapong in the diagnosis and treatment of D.G.W.'s midgut volvulus. They merely offer the conclusory statement that "Dr. Wiswell lacks the requisite knowledge, skill, experience, training, or education to opine on the standard of care applicable to a surgeon or a pediatric surgeon." ECF No. 225-3 at PageID # 3028. Not so—Dr. Wiswell's credentials reveal he is qualified to opine on diagnosing and treating a midgut volvulus.

First, neonatologists, like Dr. Wiswell, generally have the training and qualifications to address a midgut volvulus. Midgut volvulus is a serious, potentially life-threatening illness that predominantly affects newborns. As such, all physicians in the overarching field of pediatrics, including neonatologists, are trained to identify the condition. ECF No. 231-9 at PageID # 3462. The diagnosis does not require surgical expertise.

Moreover, as the KMS Defendants' own expert puts it, neonatologists specialize in "the diagnosis and treatment of the fetus and critically ill newborn during the first 30 days of life, an age group which presents with unique challenges by reason of size, physiology and metabolism." ECF No. 231-5 at PageID # 3427.[5]  Given that the midgut volvulus is a condition that typically presents in newborns, with 50% of cases occur during the first week of life, ECF No. 231-9 at PageID # 3463, it follows that training in neonatology helps to qualify a physician to opine as to the standard of care for diagnosing and treating the condition. Indeed, as Dr. Wiswell explains, when it comes to identifying and treating midgut volvulus, "[neonatologists are] on the front lines, we're the first ones who see it first, we're the first ones who recognize it." *Id.* at PageID # 3471.

Finally, Dr. Wiswell has taught other physicians—including pediatric surgeons—how to recognize and address a midgut volvulus. ECF No. 230-1 at PageID # 3237. And unlike the expert in *Krizek*, who had no experience addressing the condition at issue (Wernicke's encephalopathy) in an emergency

---

[5] While not relevant to its *Daubert* analysis, the court points out an obvious irony—that the KMS Defendants have themselves hired a neonatologist to opine on the same standard of care. *See* ECF No. 231-5 at PageID # 3427 (the KMS Defendants' expert witness, Dr. Friedlich, explaining that his experience as a neonatologist "qualifies [him] to offer informed and valid opinions on the standard of care required by the health care providers who treated [D.G.W.], and the cause of her disease and outcome"). The KMS Defendants make no effort to explain why their neonatologist is competent to opine as to the applicable standard of care while Dr. Wiswell is not. *See generally* ECF No. 225; ECF No. 233-3 at PageID # 3512.

16

room setting, Dr. Wiswell has been personally involved in diagnosing and treating a midgut volvulus on at least 30 occasions. ECF No. 231-9 at PageID # 3467.

These qualifications demonstrate that Dr. Wiswell is competent to provide expert testimony regarding diagnosis and treatment of an infant suffering from a midgut volvulus. Because the KMS Defendants have failed to point to any *specific* deficiencies in Dr. Wiswell's knowledge, skill, experience, training, or education, their argument that he cannot opine as to the standard of care applicable to Dr. Puapong fails.

**B.     Dr. Wiswell's Methodology Is Appropriate**

The KMS Defendants next argue that Dr. Wiswell's opinions are not admissible because his methodologies are not scientifically reliable. The court disagrees.

With respect to medical experts, the "flexible" test set forth in *Daubert I* does not require application of the factors typically used to assess the reliability of scientific evidence. *Primiano*, 598 F.3d at 565. Rather, because "medicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit," *id.* (quoting Cecil Textbook of Medicine 1 (James B. Wyngaarden & Lloyd H. Smith Jr. eds., 17th ed. 1985)), "[a] trial court should admit medical expert testimony if physicians would accept it as useful and reliable." *Id.* (quoting *United States v.*

17

*Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006)). And because "'medical knowledge is often uncertain,'" medical testimony "need not be conclusive." *Id.* Rather, where "credible, qualified experts disagree," the litigants are "entitled to have the jury decide upon [the experts'] credibility, rather than the judge." *Sandoval-Mendoza*, 472 F.3d at 654, 656.

Here, Dr. Wiswell's opinions are admissible because they are based on sufficiently reliable methods and data. Dr. Wiswell based his opinions on his review of D.G.W.'s medical records from Tripler, Kapiolani, and Lurie Children's Hospital; imaging studies from all three facilities; the expert reports of six doctors; and the SAC. ECF No. 225-10 at PageID # 3135. He used his own knowledge and experience in concert with reference to leading peer-reviewed journal articles and textbooks discussing the midgut volvulus to assess these materials. ECF No. 231-9 at PageID # 3466. And he drew from his own extensive experience treating midgut volvulus as part of a medical team to opine as to the responsibilities of different members of such a team, including the responsibilities of the pediatric surgeon. *Id.* at PageID ## 3471-72. Given Dr. Wiswell's considerable experience in neonatal medicine—including his experience diagnosing and treating midgut volvulus—the methods he used to inform his opinions are reliable and, therefore,

admissible.[6]  *See Primiano*, 598 F.3d at 567 (holding expert physician's opinions admissible based on that physician's use of "knowledge and experience" "against a background of peer-reviewed literature" to evaluate a patient's medical records and imaging studies).

///

///

///

///

///

///

///

///

---

[6] Inexplicably, the KMS Defendants argue that Dr. Wiswell's opinions are inadmissible because they are based solely on "hindsight."  ECF No. 225-3 at PageID # 3029.  But this proposition is contradicted by the record.  During Dr. Wiswell's deposition, the KMS Defendants' counsel asked him directly: "did you use the retrospective knowledge of [D.G.W.'s] mid gut found on September 23, 2016, solely to come to the conclusion that [D.G.W.] had a midgut volvulus when she came to Tripler on the 22nd of September?"  To which Dr. Wiswell replied: "[n]o, I did not."  ECF No. 231-9 at PageID ## 3459-60.

The KMS Defendants also attempt to argue that Dr. Wiswell's opinions are inadmissible because "Dr. Wiswell never reviewed any of the deposition transcripts in coming to his opinions in this matter."  ECF No. 225-3 at PageID # 3031.  But the KMS Defendants put forth no authority, nor has the court been able to find any, suggesting that an expert must take into account deposition testimony.  The fact that Dr. Wiswell's review was not wholly comprehensive does not render it inadmissible.  To the extent the KMS Defendants wish to attack his opinions because they did not incorporate deposition testimony, they may do so at trial.  *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing *Daubert I*, 509 U.S. at 596).

## V. <u>CONCLUSION</u>

For the foregoing reasons, the KMS Defendants' Motion to Preclude is DENIED.

IT IS SO ORDERED.

Dated: Honolulu, Hawaii, May 18, 2021.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*John David Warren et al. v. United States et al.*, Civ. No. 19-00293, Order Denying Defendants Kapiolani Medical Services and Dr. Devin Puapong, M.D.'s Motion to Preclude the United States' Expert, Dr. Thomas Wiswell, M.D., from Opining as to Standard of Care, ECF No. 225.